**96 So.2d 487**

Gordon I. ATWATER

v.

Alberta Miller YOUNG et al.

No. 43038.

June 10, 1957.

Weiss & Weiss, New Orleans, for defendant-appellant.

Wood Brown, New Orleans, for liquidator-appellee.

Doyle, Smith & Doyle, Donald W. Doyle, New Orleans, for plaintiff-appellee.

HAWTHORNE, Justice

This case is a sequel to Atwater v. Young, 226 La. 840, 77 So.2d 414.

Gordon I. Atwater and Mrs. Alberta Miller Young formed a partnership in 1948 to carry on the business of consulting petroleum geologists. Under the terms of the partnership agreement Atwater's interest in the partnership was 90 per cent and Mrs. Young's interest was ten per cent. During the summer of 1952 Atwater notified Mrs. Young of his intention to dissolve the partnership, and on August 20, 1952, he brought suit praying that a receiver be appointed, whereupon Mrs. Young answered and asked for the appointment of a liquidator. A judicial liquidation was agreed upon by the parties, and Mr. Wood Brown, a New Orleans attorney, was asked by them to serve as liquidator and appointed to this position by the court on August 22, 1952. Two months later Atwater and Mrs. Young entered into a settlement agreement dividing all assets and properties of the partnership. Pertinently, under the terms of this agreement the accounting firm of Barton, Pilié and Wermuth was to audit the partnership books and determine the net capital accounts of the partners as of September 9, 1952, the date on which the partnership ended; all fees contracted for up to and including September 9, 1952, were to be credited on the partnership books; expenses incident to completing partnership business were to be determined by arbitration if the parties could not agree upon the amount; and from the date of the execution of the settlement agreement Atwater was to have exclusive control over any remaining partnership business.

The liquidator filed his first provisional account, there was a trial of Mrs. Young's opposition, judgment was rendered in the district court homologating the liquidator's provisional account with certain modifications, and Mrs. Young appealed to this court. See Atwater v. Young, supra. While that appeal was pending in this court, the liquidator filed in the district court his second account, covering the period from March 26, 1953, through April 30, 1954. Again an opposition was filed by Mrs. Young, but before the second account was tried on the merits, this court handed down its decision affirming the lower court judgment homologating the liquidator's provisional account. Atwater v. Young, supra. Shortly thereafter, on January 25, 1955, the liquidator filed his final account in the lower court covering the period March 26, 1953, to December 31, 1954, whereupon the parties agreed that all matters in controversy in the second account should be referred to the final account. Mrs. Young then filed an opposition to the final account, and the matter went to trial.

The basis of Mrs. Young's opposition to the liquidator's final account was that many of the items listed on the liquidator's account were incorrect, and that further-

more her former partner Atwater had concealed and failed to account for various partnership assets. After 10 long days of trial, the introduction of hundreds of documentary exhibits, and volumes of testimony, much of it given by Mrs. Young herself, the trial judge approved the liquidator's final account with a few minor corrections. This appeal by Mrs. Young followed.

 In this court Mrs. Young raises no issues of law, but in general follows the same line of attack she pursued in the lower court; i.e., she contends that certain items listed on the liquidator's account are incorrect, and that various fees received by Atwater after the dissolution of the partnership should have been included in the partnership assets.

In general, Mrs. Young argues that she is entitled to a remand of this case for a completely new trial of the correctness of the final account because (1) she was not kept sufficiently informed of the auditor's decisions and given an opportunity to acquaint him with pertinent facts; (2) contrary to the partnership settlement agreement, controversial partnership expenses were not determined by arbitration; and (3) in no instance whatsoever were fees contracted for before the dissolution date of the partnership, but paid afterwards, credited on the partnership books, contrary to the partnership agreement.

These three contentions are unimpressive, and in passing we note that two of them were raised by Mrs. Young on her former appeal—the one concerning the arbitrary nature of the auditor's decisions, and the issue of arbitration. The record in this case shows that accountants employed by Mrs. Young were given every opportunity to examine the auditor's books, and every suggestion from them or Mrs. Young was given . careful attention. As for Mrs. Young's argument that she was denied the right to have expenses determined by arbitration contrary to the settlement agreement, she waived any right she had in the matter by failing to ask for arbitration and going to trial on the merits. Finally, the sweeping contention that no fees contracted for before the dissolution of the partnership were credited on the partnership books is answered by the record, which shows that the liquidator, Mr. Brown, asked the auditors to go over all of Atwater's billings immediately following the dissolution of the partnership, that Atwater submitted his billings to the auditors for some eight or 10 months after this date, and that Mr. Brown received from Atwater a total of $32,381.26 during the liquidation.

In addition to the above general criticisms, Mrs. Young raises a number of specific objections to this final account, as will be shown below:

*McCampbell:* Mrs. Young objects to this item's being charged against her per-

sonal account and not being treated as a liquidation expense. Dr. McCampbell of Tulane University was paid by the liquidator to inventory and index approximately 4,000 maps belonging to the partnership. After he had completed his work Mrs. Young told the liquidator that about 100 maps were missing, and Mr. Brown had Dr. McCampbell go over the maps with Mrs. Young to satisfy her that they were all there. For this additional work Dr. McCampbell charged $100. The liquidator stated at the trial that in his opinion this $100 charge should properly be made against the partner who caused the expense, the trial judge upheld the liquidator, and we have found no reason to disturb this finding.

*Monroe Calculating Machine:* Mrs. Young contended at the trial that she was told by Atwater to rent a Monroe Calculator for her own use, at partnership expense, during the liquidation proceedings. Mr. Brown testified that he was frankly uncertain who should pay the $79.32 rent for the machine, and had therefore "arrived at what may be said to be a Solomon's decision * * * I split it between the two of them". This explanation satisfied the trial judge, and appears fair to us.

*Gueymard v. Gravis Mitchell:* Before its dissolution the partnership contracted to do work in this case. After the dissolution Atwater received a fee of $3,000 for the work and turned over to the liquidator $1,541, retaining the rest of the $3,000 to cover his expenses. Mrs. Young makes several trivial objections about the amount withheld for expenses which we need not discuss in detail. They obviously failed to impress the trial judge as he allowed this item to stand, and his view of the matter will be accepted by us.

*Barton, Pilié, Jones & Wermuth:* This firm of certified public accountants were auditors for the partnership during its existence, and were selected by the partners as auditors for the liquidator. The record shows that this firm rendered bills totaling $4,300 to cover their services in the liquidation of the partnership, rendition of numerous accounting reports, and court testimony. In brief here Mrs. Young attacks this fee as excessive and argues that the accountants' fee should be closer to $2,000, which figure was given to the parties in these proceedings by Mr. Brown as an estimate of this item of expense during the early stages of the liquidation. We note that the $4,300 auditors' fee is acceptable to Mr. Brown and to Gordon Atwater, and the testimony of Abner Hughes, a partner in the accounting firm, shows that the fee is reasonably proportionate to the amount of work which was done by this firm in these liquidation proceedings. We share the trial judge's approval of this item.

*W. T. Smith Lumber Co.:* Mrs. Young concedes that this item was on the provisional account which was approved by this court in Atwater v. Young, supra. As it is

now res judicata, it cannot be questioned in these proceedings.

*Air Line Ticket:* Mrs. Young maintains that this item of $120.88 should have been charged against the partnership account and not against her personal one. Shortly before the dissolution of the partnership Mrs. Young and another person bought two airplane tickets to Houston, Texas, and charged the $120.88 plane fare to the partnership. Mr. Brown testified at the trial that he had asked Mrs. Young to furnish him with some evidence that this Texas trip was made on partnership business, but no verification was ever received by him, nor was any expense account ever furnished to him as liquidator. Moreover, Mr. Brown's inquiries at the airline office disclosed that the tickets were in the name of Mr. and Mrs. Young, although at the trial Mrs. Young insisted that her husband had not accompanied her on the trip. The trial judge did not accept Mrs. Young's explanation on this point, and neither do we.

*Joe W. Brown:* This big oil operator was a client of Gordon Atwater's before the partnership of Atwater & Young was formed, a client of that partnership during its four-year existence, and was still a client of Atwater's when this proceeding was tried. It is Mrs. Young's position that the fees collected by Atwater from Joe Brown after the dissolution of the partnership were the result of extensive research done for Brown during the existence of the partnership, and that therefore under the terms of the settlement agreement these fees are a partnership asset.

The record shows that on September 9, 1952, the date the partnership was dissolved, there was no contract between Joe Brown and the partnership; that any work Atwater ever did for the oil operator was paid for within a month after it was done; and that the relationship between Brown and Atwater can be terminated at will by either party. It was the opinion of the auditor, the liquidator, and the trial judge that the fees paid by Joe Brown to Atwater after the dissolution of the partnership did not constitute partnership assets, and in her brief filed here Mrs. Young gives no valid reason why this finding should be disturbed.

*Miami Corporation:* This is another attempt by Mrs. Young to swell the partnership assets, and incidentally her fractional share in these assets.

Around April of 1952 Atwater & Young began to receive a monthly retainer of $500 from Miami Corporation, terminable at will on both sides, in return for which Atwater was to render services to Miami in connection with the corporation's lands in Louisiana. Some time during the following months Miami sold some of its hold-

ings to Iberia Corporation; Atwater was consulted by Miami at this time and did work in connection with the sale. Atwater said at the trial that for his work in connection with this transaction he received no commission, no overriding royalty—nothing except his regular retainer, although he was paid for a special study he did for Miami at this time. Atwater's testimony is borne out by letters written to Wood Brown and Mrs. Young herself by S. G. Glaysher, secretary-treasurer of Miami Corporation, and it was accepted as true by the trial judge, who refused to adopt Mrs. Young's claim that Atwater's continuing monthly retainer of $500 should be regarded as a commission on the sale. There is absolutely no evidence to indicate that there is any merit in Mrs. Young's view of the matter.

*Benjamin Minerals*: On December 30, 1952, E. V. Benjamin sold an oil royalty to J. S. Abercrombie Foundation for $500,000, and in connection with this sale Atwater made a commission. Mrs. Young has claimed throughout these proceedings that this commission is a partnership asset, even though the sale took place after September 9, 1952, the date the partnership was dissolved, because the partnership had worked up geological data on the Benjamin royalties, and the sale had been discussed before the partnership was dissolved. At the trial Atwater denied this and said that ne-

gotiations for the sale by Benjamin to Abercrombie Foundation began only in November, 1952, and the testimony of E. V. Benjamin on this point is to the same effect. This item is clearly not a partnership asset.

*Royalties Associates*: Shortly before the partnership of Atwater & Young began, Gordon Atwater and a number of businessmen formed Royalties Associates, for the purpose of buying up mineral interests in various parts of this country. Up until February, 1951, Atwater received a salary from Royalties Associates totaling over $11,000 for geological work done by him for the corporation, and this money was turned over to the partnership. However, Mrs. Young contends in these proceedings that Atwater's interest in the sums distributed as a dividend by Royalties Associates, Inc., was in effect a payment for geological services rendered by him to the company, and that therefore these sums should also have been turned over to the partnership. In contradiction of Mrs. Young's claims, the minutes of the meetings of the board of directors of Royalties Associates, Inc., show that Atwater was paid a salary by Royalties in return for any geological services rendered by him for the corporation, that his salary from Royalties ceased when there was no more need for his services as a geologist. Thereafter Royalties continued to purchase royalty, but E. V. Ben-

jamin, a member of Royalties Associates, testified at the trial that Atwater did not render professional services to the corporation in advance of every purchase of oil interests, that the acquisition of royalty has to be done very promptly, that there is not usually enough time to make any real search into the problem, that they had often bought royalty over the lunch table without ever looking at a map, and that one of their best producing properties was in Texas and had been bought over the telephone from an oil broker without any further information on the subject.

The liquidator did not include Atwater's interest in sums declared as dividends by Royalties in the partnership assets, the trial judge found no reason to disagree with the liquidator on this classification, and the trial judge's finding on this item impresses us as correct.

*Fausse Point*: During the existence of the partnership here being liquidated, Atwater & Young bought certain mineral leases in what is known as the Fausse Point Area, Iberia Parish, Louisiana—a counterletter showing that Atwater held these interests for Benjamin Minerals, Inc. E. V. Benjamin testified in the lower court that actually Atwater manages this operation for the account of Benjamin Minerals, Inc., and that when Atwater transfers the leases to Benjamin Minerals, or to a third party, Atwater will receive a 10 per cent interest in the leases free of cost as his fee. The settlement agreement made between Atwater and Mrs. Young recognizes that Mrs. Young is entitled to a 10 per cent interest in the partnership's 10 per cent interest in the Fausse Point leases.

On this issue the trial judge said:

"The agreement between the client of the partnership, Benjamin Minerals, Inc., and the partnership is to the effect that these interests will be transferred only upon completion of the leasing project undertaken by Benjamin Minerals, Inc. Mrs. Young is, therefore, entitled only to a similar letter of intent as that provided by Benjamin Minerals, Inc. in favor of the partnership. The court believes that she is further entitled to a reference in said letter to the leases presently taken in the Fausse Point Area of Benjamin Minerals, Inc. and a list of the leases are on file in the record, having been obtained by the liquidator from Benjamin Minerals, Inc. The judgment rendered herein provides that such a letter incorporating such list by reference shall be delivered by Mr. Atwater to Mrs. Young."

In brief filed here counsel for Atwater says that the above instrument was delivered to Mrs. Young a year ago.

Mrs. Young argues in this court, however, that this letter is not enough, that she should not be forced to wait for her money,

that there has been income from wells in Fausse Point field on property covered by these leases for two and a half years, and that Atwater has been paying all income to Benjamin Minerals and not retaining the partnership's 10 per cent.

The record in this case makes it clear that the partnership's 10 per cent interest in these mineral leases will only accrue when Atwater transfers them to Benjamin Minerals or to a third party, and therefore the lower court has already given Mrs. Young all the relief to which she is entitled in the Fausse Point matter.

*Spartan Drilling Company*: Mrs. Young claimed at the trial that in 1951 the partnership of Atwater & Young made an agreement with Spartan Drilling Company whereby the partnership would receive a 5 per cent commission on a proposed sale of the Spartan Drilling Company's properties in Golden Meadow Field, LaFourche Parish, but that the sale was held up because of a boundary suit and also because B. & D. Cheramie sued Spartan, and all negotiations for sale had to be delayed pending determination of these suits. In short, Mrs. Young thinks that this is a prospective fee, contracted for during the partnership, and that her 10 per cent interest in it should be assured to her by the court.

We note that in the lower court counsel for Atwater denied the existence of this alleged contract with Spartan, but stated that if such a contract exists, "Mr. Atwater hereby relinquishes to that witness any interest he has in any such contract with the Spartan Drilling Company for the transfer of this property". In his decree the trial judge did not refer to the Spartan item.

Mrs. Young is now asking this court to order Atwater to give her some instrument of transfer covering her rights under this alleged contract. This we cannot do in view of the fact that Atwater denies the very existence of the contract, that there is no evidence to show it exists except Mrs. Young's testimony, that concededly no sale has taken place, and that there is not even a description of the property which is allegedly to be sold.

*Hampshire Field*: During the trial of this opposition Mrs. Young testified that in April of 1952, before the dissolution of the partnership, Atwater was retained to appraise properties in Hampshire Field, Jefferson County, Texas, for the estate of Harry Lucas, and had at that time estimated that his fee would be $1,500–$2,000; that Atwater collected a fee of $2,578.38 for doing this work early in 1953; and that therefore this fee should be entered as a partnership asset. In support of his claim that the $2,578.38 fee he received in 1953 was not a partnership asset, Atwater testified that he performed no appraisal work for the Lucas estate, as those in charge of

that estate had decided not to use his services; that the work done in connection with the Hampshire Field, for which he received the $2,578.38 in 1953, was done for other operators; and that the work had not been contracted for until after the termination of the partnership in September, 1952. The trial judge was satisfied that this fee was not a partnership asset, Mrs. Young has pointed to no evidence at variance with the lower court finding except her own testimony, and the lower court judgment in this respect will not be disturbed.

Under the heading *Miscellaneous* Mrs. Young contends that the liquidator should investigate the rights of Atwater in certain assignments made by Helis; the true interest of the partners in the royalty interest called A. J. Caillouette; and every instance in which Mrs. Young's testimony was at variance with Atwater's.

Mr. Brown, the liquidator, stated at the trial of this case that he had investigated every controversial matter in the liquidation on which he had been given definite, substantial evidence by either of these litigants—everything "except just bold accusations without support"—but that in his opinion many of the so-called issues raised by the opposition were in the nature of a fishing expedition. If the liquidator did not investigate any matters in this liquidation which were questioned by Mrs. Young, it is probably because, in his opinion, they fell into the latter category.

The district court judgment is affirmed. Mrs. Young is to pay all costs of this appeal.